# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### CASE NO. _____

| | | |
|---|---|---|
| SEAN TAYLOR and RACHEL HAWKINS *on behalf of themselves and others similarly situated*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT—CLASS ACTION** |
| SYNCHRONY BANK f/k/a GE CAPITAL CONSUMER LENDING, INC., and SYNCHRONY FINANCIAL, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiffs Sean Taylor and Rachel Hawkins, individually and on behalf of a class of similarly situated persons, hereby file this Class Action Complaint, making the allegations herein upon personal knowledge as to themselves and their own acts, and upon information and belief and based upon investigation of counsel as to all other matters, as set forth herein.

## <u>INTRODUCTION</u>

1.      Since the beginning of the Iraq War through the present, members of our military services have been asked to make many sacrifices for our nation. One of these sacrifices is financial: leaving family, friends, and the comforts of civilian life to answer our country's call to duty also requires leaving behind employment, a career, and financial security. The Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 *et seq.* (formerly 50 U.S.C. App. §§ 501 *et seq.*), was enacted to address this sacrifice, and seeks "to enable [servicemembers] to devote their entire energy to defense needs of the Nation." 50 U.S.C. § 3902(1). The SCRA guarantees that all debts incurred by a servicemember before being called to active duty are

reduced to a 6% interest rate, from the date deployment orders are received through the ensuing active-duty period, as required by 50 U.S.C. § 3937. The Act also requires financial institutions to permanently forgive interest above 6%.

2. Defendants Synchrony Bank and Synchrony Financial (collectively "Synchrony") markets heavily to servicemembers as a bank dedicated to military members, veterans, and their families. To attract and retain this business, Synchrony promises contractual benefits that are more generous than required by the SCRA, including a 0% interest rate.

3. Synchrony breached its duties to servicemembers and veterans in numerous ways:

4. When Synchrony does provide a reduced interest rate to servicemembers, those benefits are often inadequate and/or illusory because Synchrony does not in fact reduce the interest rate to 0% as required by contract or 6% as required by the SCRA and permanently forgive that additional interest. For example, but not by way of limitation, rather than permanently forgiving the interest and fees, Synchrony retroactively takes back this benefit by imposing an interest rate penalty on servicemembers after they leave active duty and return to civilian life.

5. This "veteran penalty" is carried out by Synchrony imposing certain interest and fee increases *only on returning servicemembers*. No other customers are subject to these interest and fee penalties. By imposing this veteran penalty only on SCRA recipients, and not on any other customer, Synchrony creates the illusion of SCRA compliance without actually lifting servicemembers' financial burden as the SCRA requires. Synchrony's promise to be more generous than the SCRA – by providing a 0% interest rate and no fees – is also made false by the veteran penalty.

6. The imposition of the veteran penalty is not only a violation of the SCRA and a breach of contract; it violates federal law specifically designed to prevent banks from creating such

2

debt traps. The veteran penalty is carried out by Synchrony illegally increasing interest and fees on outstanding balances. This is an unfair and deceptive practice which has been outlawed in our Nation since 2009, when Congress passed the Credit CARD Act of 2009.

7.     Synchrony's practice undermines our nation's commitment to servicemembers and veterans. When veterans return from active duty, they must rebuild their lives often without employment, and are uniquely vulnerable to Synchrony's veteran penalty. By raising rates on veterans' outstanding balances – from 0% to as high as 26% – Synchrony places our Nation's heroes into a debt trap. These veterans are already subject to intense emotional, familial, and financial stress, and Synchrony's veteran penalty illegally and immorally forces veterans into immediate financial stress. It violates the very purpose of the SCRA's forgiveness requirement, which is to prevent veterans from experiencing financial distress upon their return from active duty.

8.     The named plaintiffs in this action represented and protected our nation through military service. They now seek to represent and protect their fellow servicemembers and veterans through this class action.

## JURISDICTION AND VENUE

9.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the laws of the United States, including the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 4042(a), and the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("the Credit CARD Act"), 15 U.S.C. §§ 1601 *et seq.*

10.     In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) and (6) because the aggregate claims of the proposed class members exceed $5,000,000, and at least one named plaintiff resides in a different state than Synchrony. The amount in controversy in

this matter includes, but is not limited to, actual and consequential monetary damages, disgorgement of Synchrony's ill-gotten gains, punitive damages, civil penalties, and attorneys' fees and costs.

11.     This Court has personal jurisdiction over Synchrony, because many of the business activities, events, and/or wrongdoing giving rise to the claims asserted in this Complaint occurred in North Carolina, and under *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023) because its actions, as discussed below, constitute consent to jurisdiction in North Carolina.

12.     Venue is proper in this Court, as Synchrony conducts business within the district, and many of the business activities, events, and/or wrongdoing giving rise to the claims asserted in this Complaint occurred in North Carolina. Maintaining the venue of this class action in this district is therefore proper under 28 U.S.C. § 1391.

## PARTIES

13.     Plaintiffs file this Complaint in their individual capacity, and as a class action on behalf of themselves and all others similarly situated. They, along with other class members who may be named as class representatives at the time a motion is filed to certify the proposed class, will represent the class identified below.

14.     Plaintiffs had one or more interest-bearing obligations to Synchrony that qualified for and legally required reduced interest and/or fees benefits from Synchrony because of an obligor's military service.

15.     Defendant Synchrony Bank is a federal savings bank within the meaning of 12 U.S.C. § 1813(b)(2) and 12 U.S.C. § 1464. Synchrony Bank is incorporated in Delaware with a principal place of business in Utah.

4

16.     Defendant Synchrony Financial is a federal savings bank holding company headquartered in Connecticut. Synchrony Bank is a wholly owned subsidiary of Synchrony Financial; it is Synchrony Financial's primary subsidiary and its sole banking subsidiary.

17.     Synchrony has long consented to general jurisdiction in North Carolina. Several of Synchrony's predecessors, including GE Capital Consumer Lending, Inc. registered to do business in North Carolina decades ago and consented to service of process through North Carolina registered agents, including the Secretary of State, 2 South Salisbury Street, Raleigh, NC 27601. GE Capital Consumer Lending, Inc. became GE Money Bank which was renamed GE Capital Retail Bank and then Synchrony Bank.

18.     For decades, Synchrony has engaged in substantial, continuous business in the State of North Carolina with a corporate office and hundreds of employees located in North Carolina. Speaking on behalf of Synchrony in 2015, Synchrony Financial executive vice president and COO noted Synchrony has had a presence in North Carolina since 1979, called North Carolina "home to one of our key sites," and stated that Synchrony has "plans to be here for many years to come." As of 2015, Synchrony's main North Carolina location had "almost 400 employees, with capacity to seat about 1,000 experienced and entry-level personnel working in a number of key business functions including: Sales, Marketing, Call Center Operations, Surveillance, Compliance, Risk, Finance, IT, Vendor Management, Supplier Risk, Business Continuity and Collections," and Synchrony was actively hiring to grow its North Carolina high-level management and call center workforce by over 200 jobs by 2016. Today, Synchrony has over 1,300 employees in North Carolina, including key senior directors and vice presidents such as the senior director of compliance.

5

19.     Among other business functions located in North Carolina, Synchrony's Compliance and IT business functions shape the bank's application of military benefits and interest rate increases and related calculations which lead directly to the harms described herein.

20.     Synchrony also has extensive customer-facing operations based in North Carolina, including operations at issue in this lawsuit. Synchrony's call-center branch is located in Charlotte, North Carolina. On information and belief, to obtain military benefits on a Synchrony credit card, customers can call Synchrony, and when they do so, they will be directed to a representative at the North Carolina call-center. North Carolina also has Synchrony's fifth largest loan receivables portfolio, by state.

21.     If the information currently available to Plaintiffs is insufficient to show this Court's personal jurisdiction over Synchrony for all claims in this Complaint, jurisdictional discovery will confirm personal jurisdiction over Synchrony for all claims. Jurisdictional discovery is required because Synchrony has key operations and staff related to its credit cards, compliance, risk management, information technology, and SCRA and MLA compliance in North Carolina, but it does not publicly disclose the precise decision making taking place here.

22.     The Court also has general jurisdiction because Synchrony maintains minimum contacts with the State of North Carolina to satisfy the due process clause of the United States Constitution and has sufficient minimum contacts with the State of North Carolina such that maintenance of this suit does not offend traditional notions of fair play and substantial justice.

## CLASS ACTION ALLEGATIONS

### Class Definition

23.     In accordance with Federal Rule of Civil Procedure 23, Plaintiffs bring this action in their individual capacity and as a class action on behalf of themselves and all others similarly

situated. They, along with other class members who may be named as class representatives at the time a motion is filed to certify the proposed class, will represent the following class:

> **National Military Class:** All persons who requested and/or received reduced interest and/or fee benefits from Synchrony on an interest-bearing obligation because of an obligor's military service, but excluding persons who have executed a release of the rights claimed in this action.

24.     This class action satisfies the requirements of Federal Rule of Civil Procedure 23, including, but not limited to, numerosity, commonality, typicality, adequacy, and predominance.

**Impracticable Joinder**

25.     The proposed class is composed of tens of thousands of persons, geographically dispersed throughout the United States and serving the country overseas, the joinder of whom in one action is impracticable. The disposition of their claims in a class action will provide substantial benefits to both parties and the Court. Synchrony, either directly or through affiliated entities, is in possession of the names and addresses of all class members.

26.     Class treatment is particularly appropriate here because Synchrony conducts business in every jurisdiction in the United States. Further, this matter involves multiple federal statutes which Synchrony extensively and harmfully misapplied and violated.

**Risk of Inconsistent or Varying Adjudications**

27.     Prosecution of separate actions by class members would risk inconsistent or varying adjudications, which would establish incompatible standards of conduct for Synchrony.

28.     Further, the outcomes of separate actions by individual members of the class could, as a practical matter, be potentially dispositive of the interests of other members of the class and

substantially impair or impede their ability to protect their interests. Class-wide adjudication of Plaintiffs' claims, therefore, is appropriate.

29.     Synchrony has acted on grounds generally applicable to the class, thereby making class-wide adjudication of these claims appropriate.

**Common Questions of Law and Fact**

30.     There exists a well-defined community of interests and questions common to the class, which predominate over individual factual or legal questions. These common factual and legal questions include, but are not limited to:

(a)     Whether Synchrony violated the SCRA by failing to grant SCRA benefits to qualifying servicemembers;

(b)     Whether Synchrony violated the SCRA by failing to reduce interest rate to 6%;

(c)     Whether Synchrony violated the SCRA by imposing a "veteran penalty" on recipients of SCRA benefits upon their leaving active duty, thereby taking back the SCRA benefits and failing to permanently forgive interest above 6%;

(d)     Whether Synchrony's contractual military benefits program ("Military Benefits Program,") as described herein, constituted an enforceable contract term or a separately enforceable contract between Synchrony and class members, and whether Synchrony's violations of the terms of its program gives rise to liability for breach of contract;

(e)     Whether Synchrony's practices violated the Truth in Lending Act ("TILA"), including but not limited to violations of the Credit CARD Act of 2009;

(f)     Whether Synchrony knew, reasonably should have known, or recklessly disregarded that its acts and practices were unlawful;

(g)     Whether Plaintiffs and the class are entitled to statutory, actual, consequential, and/or punitive damages;

(h)     Whether Plaintiffs and the class are entitled to an accounting;

(i)     Whether Synchrony owed fiduciary or special duties to Plaintiffs and the class and whether they breached such duties; and

(j)     Whether Plaintiffs and the class are entitled to recovery of attorney's fees and costs.

**Typicality**

31.     The individual Plaintiffs and the class representatives to be named are asserting claims that are typical of the claims of the entire class, and the class representatives will fairly and adequately represent and protect the interests of the class in that they have no interests antagonistic to those of the other members of the class.

**Fair and Adequate Representation**

32.     The individual Plaintiffs have retained counsel who are competent and experienced in the handling of litigation, including class action litigation, and who will fairly and adequately represent and protect the interests of the class. Likewise, the class representatives will fairly and adequately represent and protect the interests of the class as a whole.

**Superiority of Class Action Procedure**

33.     The individual Plaintiffs and other class members have all suffered damages as a result of Synchrony's unlawful and wrongful conduct. Absent a class action, Synchrony will likely retain a substantial unlawful gain, its conduct will go un-remedied and uncorrected, and the class

members will likely be deprived of adequate relief. Class action treatment of these claims is superior to handling the claims in other ways.

34.     Certification of the class is appropriate under Federal Rule of Civil Procedure 23.

## STATEMENT OF FACTS

**Plaintiff Sean Taylor**

35.     Plaintiff Senior Master Sergeant Sean Taylor resides in Clover, South Carolina. He has served our Nation since 2007, including service in the Air Force Reserves and Air Force Air National Guard, and on deployment to Iraq.

36.     Synchrony accepted Mr. Taylor into its Military Benefits Program for his CareCredit (Synchrony) credit card. When Synchrony terminated Mr. Taylor from its Military Benefits Program, Mr. Taylor had a balance of over $7,500 on his card. Synchrony raised the interest rate on that outstanding balance from 0% to 26.99%.

37.     Synchrony accepted Mr. Taylor into its Military Benefits Program for his Sam's Club (Synchrony) credit card. When Synchrony terminated Mr. Taylor from its Military Benefits Program, Mr. Taylor had a balance of over $2,600 on his Sam's Club card. Synchrony imposed the veteran penalty and raised the interest rate on that outstanding balance from 0% to 19.9% in October 2023.

38.     Synchrony accepted Mr. Taylor into its Military Benefits Program for his CareCredit (Synchrony) credit card. When Synchrony terminated Mr. Taylor from its Military Benefits Program, Mr. Taylor had a balance of over $7,500 on his CareCredit card. Synchrony imposed the veteran penalty and raised the interest rate on that outstanding balance from 0% to 26.99% in October 2023.

39.     Prior to his active duty, Synchrony did not send Mr. Taylor notice, in a clear and conspicuous manner, that his interest rate on outstanding balances incurred at 0% would increase to between 19.9% and 26.99%, or when precisely that would occur.

40.     Synchrony's violations of law and breach of contract forced Mr. Taylor to pay additional interest and fees.

**Plaintiff Rachel Hawkins**

41.     Plaintiff Rachel Hawkins resides in Beavercreek, Ohio. She has served our Nation since 2003 in the Air Force, and she retired in 2018 as a Master Sergeant.

42.     Synchrony accepted Ms. Hawkins into its Military Benefits Program for her PayPal (Synchrony) credit card. When Synchrony terminated Ms. Taylor from its Military Benefits Program, Ms. Taylor had a balance of over $3,000 on her card. Synchrony raised the interest rate on that outstanding balance from 0% to 23.99%.

43.     In her last month in the Military Benefits Program, Ms. Hawkins had over $3,000 on her credit card, but her periodic statement showed the following balances and applicable interest rates:

| INTEREST DETAILS | | | | |
| --- | --- | --- | --- | --- |
| INTEREST CHARGE CALCULATION | | Your Annual Percentage Rate (APR) is the annual interest rate on your account. | | |
| Balance Type | Annual Percentage Rate(APR) | Balance Subject to Interest Rate | Interest Charged | Current Balance |
| Standard Purchases | 0.00% | $0.00 | $0.00 | $2,859.77 |
| PayPal Send Money Cash Advances | 0.00% | $0.00 | $0.00 | $84.98 |
| Balance Prior To Terms Change | 0.00% | $0.00 | $0.00 | $455.25 |

44.     The following month, Synchrony applied the veteran penalty and increased the interest rate on Ms. Hawkin's outstanding balances, shown on her periodic statement as follows:

| INTEREST DETAILS | | | | |
|---|---|---|---|---|
| INTEREST CHARGE CALCULATION | | Your Annual Percentage Rate (APR) is the annual interest rate on your account. | | |
| Balance Type | Annual Percentage Rate(APR) | Balance Subject to Interest Rate | Interest Charged | Current Balance |
| Standard Purchases | 23.99% (v) | $2,859.77 | $58.27 | $2,918.04 |
| PayPal Send Money Cash Advances | 23.99% (v) | $84.98 | $1.73 | $86.71 |
| Balance Prior To Terms Change | 23.99% (v) | $443.95 | $9.04 | $414.29 |
| (v)=Variable Rate | | | | |

45.     Prior to her active duty, Synchrony did not send Ms. Hawkins notice, in a clear and conspicuous manner, that her interest rate on outstanding balances incurred at 0% would increase to 23.99%, or when precisely that would occur.

46.     Synchrony's violations of law and breach of contract forced Ms. Hawkins to pay additional interest and fees.

**General Allegations**

47.     Synchrony has systematically violated the SCRA in numerous ways.

48.     First, on information and belief, Synchrony routinely denies SCRA benefits to qualified servicemembers, including servicemembers the Defense Manpower Data Center (DMDC) showed qualified for SCRA benefits.

49.     Second, when Synchrony does provide a reduced interest rate pursuant to the SCRA and its military benefits program, those benefits are often inadequate and/or illusory because Synchrony does not in fact reduce the interest rate to 0% as required by contract or 6% as required by the SCRA and permanently forgive that additional interest. For example, but not by way of limitation, rather than permanently forgiving the interest and fees, Synchrony retroactively takes back this benefit by imposing an interest rate penalty on servicemembers after they leave active duty and return to civilian life.

50.     This "veteran penalty" is carried out by Synchrony imposing certain interest and fee increases *only on returning servicemembers*.  No other customers are subject to these interest

and fee penalties. By imposing this veteran penalty only on SCRA recipients, and not on any other customer, Synchrony creates the illusion of SCRA compliance without actually lifting servicemembers' financial burden as the SCRA requires.

51.     Synchrony's promise to be more generous than the SCRA – by providing a 0% interest rate and no fees – is also made false by the veteran penalty. Through the veteran penalty, Synchrony takes back the contractual benefits it has promised.

52.     When Synchrony terminates a customer's military benefits, Synchrony raises the interest rate and fees on any outstanding balances on the servicemember's credit card.

53.     When Synchrony terminates a customer's military benefits, Synchrony raises the interest rate and fees on all outstanding balances on the servicemember's credit card, whether the debt was incurred before, during, or after active duty.

54.     Synchrony does not increase interest rates on other non-military customers' outstanding balances. This type of interest rate increase (increasing interest rates on outstanding balances) is imposed only on customers whose SCRA benefits are terminating, who are typically veterans.

55.     By increasing interest rates on veterans' and servicemembers' outstanding balances, Synchrony recoups part of the cost of providing interest rate benefits to servicemembers under the SCRA and Military Benefits Program.

56.     The veteran penalty is carried out by Synchrony increasing interest and fees on outstanding balances. This is an unfair and deceptive practice which has been outlawed in our nation since 2009, when Congress passed the Credit CARD Act of 2009.

57.     When a servicemember is enrolled into the Military Benefits Program, Synchrony sends them a form letter confirming their SCRA coverage and informing the servicemember of the benefits they will receive under the Military Benefits Program.

58.     When Synchrony confirms SCRA benefits, Synchrony does not provide a legally sufficient disclosure of the length of the benefit period or the annual percentage rate that would apply after the expiration of the period.

59.     Synchrony's letters confirming enrollment in the Military Benefits Program are sent at a time when the servicemembers are going onto or are already on active duty, so many servicemembers do not have the capacity to focus on those letters or may not receive them at all.

60.     Synchrony did not and does not disclose to Plaintiffs and class members the length of the period of interest rate reduction or the interest rate that will apply after that period, prior to the commencement of SCRA and Military Benefits Program interest rate reductions.

61.     The terms of Synchrony's Military Benefits Program included certain benefits that Synchrony considered to be more generous than those required by the SCRA. Those terms evolved over time but were uniform across customers at any given point in time.

62.     The terms of the Military Benefits Program were well documented and systematically communicated to class members; they became terms of the agreements between the parties and therefore became enforceable in contract.

63.     Plaintiffs and other class members relied on Synchrony's representations regarding the Military Benefits Program when deciding to maintain their accounts with Synchrony and to incur more debts on those accounts. If Synchrony had failed to provide this competitive program, Plaintiffs and other class members would have refrained from incurring additional debt with Synchrony and/or closed their accounts with Synchrony and moved to another bank.

64.     Despite their representations to Plaintiffs and other class members, Defendant failed to comply with the SCRA and the terms of its Military Benefits Program. Specifically, Defendant failed to reduce the interest rates on servicemembers' accounts as promised and required, failed to waive fees as promised, and failed to properly calculate the debt forgiveness requirements of both the SCRA and the Military Benefits Program.

65.     One method by which Defendant overcharged servicemembers was by failing to properly calculate retroactive adjustments, which are the mechanism by which banks refund servicemembers for improper fees and interest incurred between the start of the SCRA's benefits period and the time the banks adjust the credit card's terms to comply with the SCRA. The failure to properly calculate the retroactive adjustment constitutes an overcharge under the SCRA. Relatedly, Defendant failed to properly apply SCRA benefits during the entire qualifying period. As a result, Defendant improperly inflated servicemembers' principal balances, and subsequently charged compounded interest on those improper balances.

66.     Synchrony's Military Benefits Program provides servicemembers with a 0% interest rate on all balances on their credit cards, whether the debt was incurred before active duty, during active duty, or, upon information and belief, during a defined period after active duty ("extended benefit period").

67.     Synchrony offered the Military Benefits Program and its associated benefits to appear competitive in the consumer banking market and to retain the business of servicemembers.

68.     On information and belief, Synchrony established the 0% interest rate as part of its Military Benefits Program to be competitive with other banks.

69.     Synchrony established its Military Benefits Program to be competitive with other banks.

70.     On information and belief, Synchrony waives fees as part of its Military Benefits Program to be competitive with other banks.

71.     The SCRA does not require Synchrony to provide a 0% interest rate as part of its Military Benefits Program.

72.     The SCRA does not require Synchrony to lower interest rates or waive fees for balances incurred during active duty.

73.     The SCRA does not require Synchrony to provide benefits after the end of active duty as part of its Military Benefits Program.

74.     The SCRA does not require Synchrony to waive all fees as part of its Military Benefits Program.

## ALLEGATIONS AS TO DISCOVERY

75.     Some if not all the violations and breaches described herein remain ongoing. Synchrony's violations of the SCRA and the Credit Card Act resulted in improper inflation of the principal balances owed by Plaintiffs and class members, and subsequent monthly interest being charged on these inflated balances. Thus, each and every month in which Synchrony overcharged interest or fees on servicemembers' accounts constituted an ongoing violation of, *inter alia*, the SCRA and TILA.

76.     Each month, Synchrony sent incorrect periodic statements to Plaintiffs and class members, including by misstating applicable and applied interest rates and/or their duration, constituting an ongoing violation of laws and regulations.

77.     The policies behind the SCRA, and the facts described herein, require an equitable tolling of any statute of limitations. Synchrony should not be allowed to retain their ill-gotten gains resulting from such improper activity.

## FIRST CAUSE OF ACTION
### (Violation of the Servicemembers Civil Relief Act)

78.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

79.     Plaintiffs, on behalf of themselves and the class, have a private right of action for violations of the SCRA pursuant to 50 U.S.C. § 4042.

80.     The SCRA, formerly known as the War and National Defense Soldiers' and Sailors' Civil Relief Act of 1940, guarantees that all debts incurred by a servicemember or servicemember reservist before being called to active duty will be reduced to an interest rate of 6% from the date of their orders, and during the ensuing active-duty period as required by 50 U.S.C. § 3937. Several classes of fees and charges qualify as interest. Any interest above the 6% must be permanently forgiven and cannot be deferred.

81.     Synchrony violated the SCRA by failing to properly apply its provisions to the accounts and outstanding debt of Plaintiffs and other class members.

82.     Synchrony purported to reduce interest rates in compliance with the SCRA, but then took back those benefits by imposing interest and fee increases *only upon* SCRA recipients leaving active duty.

83.     Through this "veteran penalty," Synchrony recouped some or all of the interest rate reduction that was provided under the SCRA. This violated 50 U.S.C. § 3937(a)(2) ("Interest at a rate in excess of 6 percent per year that would otherwise be incurred but for the prohibition in paragraph (1) is forgiven.").

84.     Synchrony also violates the SCRA by requiring servicemembers to jump through illegal hoops to obtain SCRA benefits. The SCRA allows servicemembers flexibility in proving active-duty status and thereby qualifying for the interest rate benefit:

> Not later than 180 days after the date of a servicemember's termination or release from military service, in order for an obligation or liability of the servicemember to be subject to the interest rate limitation in subsection (a), the servicemember shall provide to the creditor written notice and a copy of—
>
>> (i) the military orders calling the servicemember to military service and any orders further extending military service; or
>> (ii) any other appropriate indicator of military service, including a certified letter from a commanding officer.

50 U.S.C. § 3937(b)(1)(a).

85.     The SCRA protects the rights of servicemembers to bring a class action to enforce rights under the SCRA. To the extent that Synchrony seeks to interfere with servicemembers' rights to bring a class action, Synchrony is in violation of the SCRA.

86.     Synchrony was aware of the provisions and requirements of the SCRA. Synchrony either knew, reasonably should have known, and/or recklessly disregarded its failure to comply with the SCRA and the exploitative and deceptive nature of its policies, procedures, and decisions.

87.     Plaintiffs incurred damages as a direct and proximate result of Synchrony's violations of the SCRA. For one or more Plaintiffs and many class members, this harm is ongoing. As a result, Plaintiffs and the class members seek relief.

## SECOND CAUSE OF ACTION
### (Violation of Military Lending Act)

88.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

89.     Plaintiffs have a private right of action for violations of the Military Lending Act "MLA" pursuant to 32 C.F.R. 232.9(e).

90.     The MLA's purpose "is to impose limitations on the cost and terms of certain extensions of credit to Service members and their dependents, and to provide additional protections

relating to such transactions in accordance with 10 U.S.C. 987." 32 C.F.R. 232.1(b). The MLA protects servicemembers from unfair and predatory loan practices. The MLA also prohibits a bank from requiring a servicemember to agree to forced arbitration as a condition of extending credit. 10 U.S.C. § 987(e) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or dependent of such a member with respect to which . . . the creditor requires a borrower to submit to arbitration . . ."). Synchrony violates this provision to the extent that it seeks to force arbitration about a dispute arising out of the extension of credit to servicemembers during active duty or to their dependents.

91.    Synchrony's cardmember agreement misleads servicemembers and thereby violates the MLA's notice and disclosure requirements by telling servicemember that they are only entitled to MLA protections and exempt from forced arbitration if they were in the military when the account was opened. Synchrony's cardmember agreement states, "The following disclosures apply to you if, *at the time your account is opened*, you are a 'covered borrower' as defined in the Military Lending Act, which includes eligible active duty members of the Armed Forces and their dependents." (emphasis added). However, the MLA's protections cover the extension of credit to "covered members," which is defined based upon active-duty status, *regardless of when the account was opened*. 10 U.S.C. § 987(e); (i)(1).

92.    Under federal law, credit is extended when a cardholder makes a purchase. *Am. Express Co. v. Koerner*, 452 U.S. 233, 240-41 (1981) ("[A] credit card company such as American Express extends credit to an individual or an organization when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases. When the account is opened or renewed, the creditor has granted a right 'to incur debt and defer its payment'; when the card is used, the creditor has allowed the cardholder 'to defer payment of debt.'"); *accord Jones*

*v. Synchrony, N.A.*, 235 S.W.3d 333, 339 (Tex. App. 2007) ("Thus, by using the credit card that appellee issued to her, appellant entered into a binding contract with appellee under South Dakota law.").

93.     The extension of credit during the period of military service is indisputable in the context of this case, since Synchrony specifically changes the terms of the credit card agreement after servicemembers notify it of their active duty status, forming a new contract for credit. *See* SD Codified L § 54-11-10 ("Use of the card after the effective date of the change of terms is deemed to be an acceptance of the new terms").

94.     Synchrony's interpretation of the MLA seeks to unilaterally exempt itself from the MLA, depriving most servicemembers and their dependents of their rights under the MLA (either by misleading them about their rights or by failing to honor those rights).

95.     Synchrony was required to provide disclosures of certain MLA provisions. 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a)(1) (requiring disclosure of "the MAPR applicable to the extension of consumer credit"). By misrepresenting the scope of MLA protections, Synchrony violated the disclosure requirement.

96.     Under the MLA, Plaintiffs and the other class members are entitled to (a) void the agreement and recover interest and fees paid thereunder; (b) actual damages, but not less than $500 for each violation; (c) punitive damages; (d) injunctive relief including corrective disclosures; and (e) attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

97.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

98. Synchrony's conduct and communications informed Plaintiffs and class members of the terms of its Military Benefits Program, with an understanding that they would rely upon that program in managing their financial affairs while a servicemember was engaged in active military service. Synchrony's Military Benefits Program was developed and offered to Plaintiffs and other similarly situated customers to maintain competitiveness in the banking industry and to retain the business of servicemembers; Synchrony knew that if its program was not competitive, servicemembers would move their business to another bank.

99. The Military Benefits Program either constituted an enforceable term of Synchrony's existing contracts with Plaintiffs and class members and/or constituted a separate enforceable contract with Plaintiffs and other class members.

100. Plaintiffs and other class members maintained their accounts with Synchrony and incurred additional debt on those accounts, to Synchrony's benefit, in reliance on Synchrony's Military Benefits Program and the purported benefits offered therein by Synchrony, which were promised as competitive with those offered by other banks.

101. The terms of Synchrony's Military Benefits Program evolved over time but were always uniform across customers at any given point in time. For example, but not by way of limitation, Synchrony promised to reduce servicemembers' interest rates to 0%.

102. By increasing interest rates and not honoring its promises, Synchrony violated the terms of the Military Benefits Program, and thereby breached its contracts with Plaintiffs and class members.

103. The Military Benefits Program must be interpreted to be consistent with federal law, including the Credit CARD Act. The cardmember agreement also states that federal law governs the contract and its enforcement. Thus, when Synchrony promised to extend credit at 0%,

and waive fees, the contract prevented Synchrony from raising the interest rates and fees on outstanding balances incurred at the 0% rate. Synchrony breached the contract by later increasing the rates and fees on these outstanding balances and/or by recouping the interest rate benefit by imposing these later overcharges. This constitutes a separate breach of contract from the breaches described elsewhere.

104.    The cardmember agreement describes the calculation of interest as follows: "We multiply each daily balance by the daily periodic rate that applies to it . . . . This gives us the daily interest charges for each of your different balances." Instead, Synchrony is breaching the contract by multiplying daily balances incurred at 0% by an inflated periodic rate rather than the 0% rate that applies to the balance. This constitutes a separate breach of contract from the breaches described elsewhere.

105.    Synchrony breached the terms of the Military Benefits Program by imposing a veteran penalty on customers whose SCRA benefits had expired, thereby taking back the promised contractual benefit. This constitutes a separate breach of contract from the breaches described elsewhere.

106.    Synchrony charged Plaintiffs and class members more interest and fees than was permitted by the Military Benefits Program. Plaintiffs paid the improper interest charges and fees, and Synchrony currently retains those payments.

107.    As a direct and proximate result of Synchrony's breach of contract as described herein, Plaintiffs and class members have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

108.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

109. Synchrony breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract, including by imposing a veteran penalty to take back part or all of the promised contractual benefit.

110. Plaintiffs and class members had justified expectations that Synchrony would provide them all statutory and contractual benefits, comply with all applicable federal and state statutes, create and maintain a robust SCRA compliance program, and honestly and forthrightly provide them with information needed to understand and enforce their rights.

111. Synchrony breached its duty to Plaintiffs and class members by violating the SCRA and the Military Benefits Program, by imposing improper charges and fees, and through its misleading cardmember agreements.

112. Synchrony's breach of its duties was the direct and proximate cause of damages sustained by the Plaintiffs and the class.

**FIFTH CAUSE OF ACTION**
**(Violation of Truth in Lending Act)**

113. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

114. Pursuant to 15 U.S.C. § 1637(b), periodic statements provided by "[t]he creditor of any account under an open consumer credit plan" shall include, *inter alia*, each applicable interest rate and the range of balances to which it is applicable.

115. Synchrony's periodic statements violated this requirement, including by improperly stating the interest rate applicable to different balances and by failing to provide an accurate table of balances and applicable interest rates.

116. Plaintiffs and class members paid improperly inflated amounts to Synchrony in reliance on Synchrony's improper periodic statements.

## SIXTH CAUSE OF ACTION

### (Violation of Truth in Lending Act – Credit CARD Act of 2009)

117.    The Credit CARD Act of 2009 prohibits card issuers from raising interest rates on existing balances, known as "protected balances." 15 U.S.C. § 1666i-1. The statute provides, "In the case of any credit card account under an open end consumer credit plan, no creditor may increase any annual percentage rate, fee, or finance charge applicable to any outstanding balance, except as permitted under subsection (b)." *Id.* § 1666i-1(a). Rather, card issuers are required to separately track those protected balances and keep interest at the previous lower rate. *Id.* § 1666i-1(c). The card holder then has certain options for paying off the protected balances, such as amortizing the balance on a five-year schedule. *Id.*

118.    The CARD Act contains four exceptions to the protected balances rule, none of which apply here. *Id.* § 1666i-1(b). Defendant cannot rely upon the exception for increases in interest rates upon the expiration of a specified period of time, because active duty is by its nature not for a specified period of time and does not generally have a specified end date. Defendant's program recognizes that the duration of its Military Benefits Program is not set and will be determined based upon the actual duration of active duty, which often changes over the course of active duty. Furthermore, this exception requires that "prior to the commencement of that period, the creditor disclosed to the consumer, in a clear and conspicuous manner, the length of the period and the annual percentage rate that would apply after the expiration of the period," *id.*, which Synchrony does not do.

119.    Any attempt by Synchrony to rely upon the SCRA confirmation letters as a defense to the CARD Act claim or a waiver of rights constitutes a violation of its fiduciary duty.

120.    The Federal Reserve has recognized that the "specified period of time" exception does not apply to active duty and SCRA benefits, stating, "Under revised TILA Section 171, a creditor that complies with the SCRA by lowering the annual percentage rate that applies to an existing balance on a credit card account when the consumer enters military service arguably would not be permitted to increase the rate for that balance once the period of military service ends and the protections of the SCRA no longer apply." 12 C.F.R. Part 226, Regulation Z; Docket No. R-1370.

121.    In adopting the Regulation Z rules implementing the CARD Act, the Federal Reserve created an additional exception not contained in the statute. The rule provides:

> Servicemembers Civil Relief Act exception. If an annual percentage rate or a fee or charge . . . has been decreased pursuant to 50 U.S.C. app. 527 or a similar Federal or state statute or regulation, a card issuer may increase that annual percentage rate, fee, or charge once 50 U.S.C. app. 527 or the similar statute or regulation no longer applies, provided that the card issuer must not apply to any transactions that occurred prior to the decrease an annual percentage rate, fee, or charge that exceeds the annual percentage rate, fee, or charge that applied to those transactions prior to the decrease.

Regulation Z, § 1026.55(b)(6) (the "regulatory exemption"). In adopting the regulatory exemption, the Federal Reserve System Board of Governors made it clear that the exception only applies to rates or fees that have been reduced "by operation of the SCRA." Truth in Lending, 75 Fed. Reg. 7568, 7741 (Feb. 22, 2010).

122.    The regulatory exemption does not apply here because Synchrony reduced its interest rate under its Military Benefits Program, which were established for business reasons, not "by operation of the SCRA." These additional benefits appear "more generous" than the SCRA, but in fact they provide a more dangerous debt trap to servicemembers and veterans.

123.    In the alternative, if the regulatory exemption were applicable, it should be declared illegal, null, and void, because the CARD Act does not permit such an exemption, and depriving

veterans of protections from debt traps that are available to all other consumers is contrary to the SCRA, MLA, and TILA.

124. Synchrony violated the Credit CARD Act by increasing the interest rate on protected balances servicemembers incurred before, during, and after active duty, resulting in the imposition of unlawful fees and interest.

125. Synchrony's violations of TILA directly and proximately caused damages to Plaintiffs and the class.

126. Plaintiffs and the class are entitled to actual damages, statutory damages, and other relief under TILA.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty or Special Trust)

127. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

128. Synchrony did not have a typical arms-length lender/borrower relationship with Plaintiffs and class members. In the unique facts of this case, Synchrony took on a role of fiduciary to the Plaintiffs and the class. *Dykstra v. Page Holding Co.*, 2009 S.D. 38, ¶ 29, 766 N.W.2d 491, 497 ("The test for the existence of a fiduciary relationship between a banker and a debtor has three elements: 1) the borrower reposes faith, confidence and trust in the bank; 2) the borrower is in a position of inequality, dependence, weakness or lack of knowledge; and 3) the bank exercises dominion, control or influence over the borrower's affairs." (internal citations omitted)).

129. Alternatively, the unique relationship between Synchrony and Plaintiffs and the class members gives rise to a special duty under South Dakota Law, which governs the contract. "In determining whether a duty exists, we examine whether 'a relationship exists between the parties such that the law will impose upon the defendant a legal obligation of reasonable conduct

26

for the benefit of the plaintiff.' . . . Duty is also based upon foreseeability." *First Am. Bank & Tr., N.A. v. Farmers State Bank*, 2008 S.D. 83, ¶ 16, 756 N.W.2d 19, 26 (2008) (internal citations omitted).

130.  The facts giving rise to the fiduciary duty or special duty include but are not limited to the following:

- Plaintiffs and class members provided Synchrony with documentation of their military status, which typically included overseas deployment orders. Thus, Synchrony solicited and received notice that Plaintiffs and class members would be deployed overseas or otherwise engaged in active duty and could not fully monitor their accounts or act in an arms-length manner with the Synchrony during periods of active military service. Synchrony also received such notice when Plaintiffs and class members charged certain on-base purchases in military engagement areas. Synchrony knows that deployed customers are generally not able to attend to financial matters while deployed.

- The SCRA reflects a Congressional determination that servicemembers cannot and should not be required to protect their own financial interests while serving full time in the U.S. military. By offering SCRA benefits and specifically marketing "enhanced" benefits beyond what the SCRA provides, Synchrony acknowledges this unequal relationship and takes on fiduciary duties.

- The nature of military service also places servicemembers at a disadvantage to the bank, unlike other customers. If a bank overcharges a servicemember, the servicemember does not, as a practical matter, have the same recourse as other customers. They must still pay their bills as if the bank's calculations were

correct. Otherwise, their failure to timely pay bills can lead them to lose security clearance and, in turn, their military position and employment. Synchrony is well aware of this dynamic and thereby has undue influence over their servicemember customers.

- Members of Class informed Synchrony that they would be going on active duty, and some were being deployed, placing Synchrony on notice that these members would have a particularly difficult time monitoring their accounts like a typical customer.

131. Synchrony breached fiduciary duties owed to Plaintiffs and the class and/or the special duties, including by overcharging servicemembers and returning veterans. Any attempt by Synchrony to rely upon notice provided to servicemembers after they were called to active duty constitutes a further breach of fiduciary duties. These breaches directly and proximately caused Plaintiffs to suffer damages entitling Plaintiffs and the class to an accounting, restitution, and other equitable remedies.

## EIGTH CAUSE OF ACTION
### (Accounting)

132. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

133. Plaintiffs are entitled to an accounting either because (1) Synchrony breached fiduciary duties and/or or a special trust, or (2) the accounts that will determine the amounts that Synchrony owes to Plaintiffs are possessed only by Synchrony and are so complex that they warrant resolution through an accounting rather than traditional discovery procedures.

134. Accordingly, Plaintiffs and other class members are entitled to an accounting of all overcharges, and improper interest, fees, and charges, as well as all assets, funds, revenues, and profits received and retained by Synchrony as a result of its improper actions, as described herein.

**NINTH CAUSE OF ACTION**
**(Constructive Trust)**

135. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

136. Synchrony has wrongfully obtained, and continues to retain, certain funds and profits as a result of its misconduct, which legally belong to Plaintiffs and other class members.

137. Plaintiffs and other class members are entitled to the imposition of a constructive trust containing all assets, funds, and property derived from Synchrony's wrongful acts, with Synchrony serving as constructive trustees for the benefit of Plaintiffs.

**TENTH CAUSE OF ACTION**
**(Federal Declaratory Judgment Act)**

138. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

139. The parties have a genuine dispute over whether Synchrony's actions violate the SCRA and TILA and over the validity of the Regulation Z exception that purports to allow raising rates on veterans' outstanding balances.

140. Plaintiffs seek declaratory and injunctive relief establishing the requirement of SCRA, TILA, and MLA as applied to Synchrony's conduct and enjoining Synchrony's future violations of those statutes.

141. The Federal Declaratory Judgment Act gives this Court the discretion to entertain a declaratory judgment action. 28 U.S.C. § 2201; *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-

87 (1995). 28 U.S.C. § 2201 provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." This Court also has the power to grant "further necessary or proper relief based on a declaratory judgment." 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

**WHEREFORE,** on behalf of themselves and all other persons similarly situated, Plaintiffs respectfully pray for the following relief:

a.      An Order certifying the class, appointing the named Plaintiffs as class representatives and Plaintiffs' attorneys as class counsel;

b.      Factual findings that Synchrony has violated the Servicemembers Civil Relief Act, the Truth in Lending Act, the Military Lending Act, and other applicable statutes and rules;

c.      An award of statutory, compensatory, consequential, and punitive damages;

d.      An award of pre- and post-judgment interest;

e.      The imposition of a constructive trust containing all assets, funds, and property derived from Synchrony's wrongful acts, with Synchrony serving as constructive trustees for the benefit of Plaintiffs and class members;

f.      An Order requiring disgorgement of Synchrony's ill-gotten gains to pay restitution to Plaintiffs and all members of the class;

g.      An accounting of all assets, funds, revenues, and profits received and retained by Synchrony as a result of their improper actions;

h.    Declaratory and injunctive relief establishing the requirement of SCRA, TILA, and the

MLA as applied to Synchrony's conduct and enjoining Synchrony's future violations

of those statutes;

i.    Declaratory and injunctive relief as requested herein;

j.    Recovery of reasonable costs and attorneys fees;

k.    A jury trial on all issues so triable; and

l.    Such other relief as this Court may deem just and proper.


Respectfully submitted this 4TH day of June, 2024.

> **BALLEW PURYEAR PLLC**
>
> By:    /s/Matthew D. Ballew____
>         Matthew D. Ballew, NCSB #39515
>         2010 Ramblewood Dr.
>         Apex, NC 27523
>         Telephone: (919) 412-5920
>         Mballew@bplegalnc.com
>         *Local Civil Rule 83.1(d) Counsel for Plaintiffs*
>
> **SMITH & LOWNEY, PLLC**
>
> By:    */s/ Knoll D. Lowney*_____
>         Knoll D. Lowney, NCSB # 61997
>         Claire Tonry, WSBA # 44497
>         Marc Zemel, WSBA # 44325
>         Alyssa Koepfgen, WSBA # 46773
>         2317 E. John Street
>         Seattle, Washington 98112
>         Telephone: (206) 860-2883
>         Facsimile: (206) 860-4187
>         Knoll@smithandlowney.com
>         Claire@smithandlowney.com
>         Marc@smithandlowney.com
>         Alyssa@smithandlowney.com
>
> *Attorneys for Plaintiffs*